FILED
COURT OF APPEALS
DIVISION II

2013 JUL 30 AM 10: 28

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                      Respondent,<br><br>v.<br><br>IRVIN LEE GREENE,<br><br>                      Appellant, | No. 42263-8-II<br><br><br><br>(Consolidated with)<br><br><br><br>No. 43457-1-II |
| In re Personal Restraint Petition of<br><br><br><br>IRVIN LEE GREENE,<br><br>                      Petitioner. | <br><br><br><br>UNPUBLISHED OPINION |

HUNT, P.J. — Irvin Lee Greene appeals his jury trial convictions for stalking and felony harassment. He argues that (1) a "true threat" is an essential element of felony harassment; and (2) the amended information and the felony harassment "to convict" instruction were constitutionally deficient because they failed to include this "true threat" element.[1] In his Statement of Additional Grounds (SAG), Greene also asserts that (1) the trial court erred by failing to arraign him on the amended information; (2) the trial court erred in failing to dismiss his case, apparently sua sponte, under Knapstad;[2] (3) the trial court erred in denying his motion

---

[1] Greene also raises these issues in his Statement of Additional Grounds.

[2] State v. Knapstad, 107 Wn.2d 346, 729 P.2d 48 (1986).

to dismiss five counts of violating a domestic violence court order; (4) there is insufficient evidence to support his convictions for stalking and felony harassment; and (5) he received ineffective assistance because his trial counsel failed to file a continuance motion and a *Knapstad* motion on his behalf.

In a separate Personal Restraint Petition (PRP), which we have consolidated with his direct appeal, Greene asserts several additional grounds to support his contention that he received ineffective assistance of counsel. We affirm Greene's convictions for stalking and felony harassment, and we deny his personal restraint petition.

FACTS

I. STALKING AND FELONY HARASSMENT

Carol Marie Unkrur, a Sound Transit light rail train operator, met Irvin Lee Greene when he approached her at work to file a complaint about a security guard. Greene rode the train a couple more times, became acquainted with Unkrur, and later began a romantic relationship with her. Shortly thereafter, Unkrur ended their relationship approximately when Greene became "aggressive" and began showing up at her work, calling her names like "whore" and a "dumb b*tch" and accusing her of sleeping with other men. Verbatim Report of Proceedings (May 11, 2011) at 89.

On August 14, 2009, Greene called and texted Unkrur several times while she was out of town with her 15-year-old daughter; Unkrur refused to take his calls. Believing Greeene would not stop calling her until she answered her phone, Unkrur called Greene back when she returned home that evening. Greene asked, "Where are you at?" Unkrur responded, "I'm at home." Greene replied, "Well, I'm in your backyard." VRP (May 11, 2011) at 90. Unkrur knew that

2

Greene was capable of harming her because he had been boxing since his early teens, he was a licensed professional boxer, and he had previously told her that he had once put a woman in a "headlock." VRP (May 11, 2011) at 109. Wanting to keep Greene away from her daughter, Unkrur took him back to his house in Tacoma, where Greene told Unkrur he loved her. Unkrur responded, "No, I'm done with this. I'm done. Don't call me anymore." VRP (May 11, 2011) at 91.

But Greene began contacting Unkrur again within six hours. The next morning, he showed up at her work. Concerned for her safety, Unkrur informed her supervisor, who assigned her to a different work station at the Tacoma Dome and required that another train operator and a security guard to be with her. Later that day, Greene showed up at the Tacoma Dome station, got off the bus, made a loop around, reboarded again one to two buses later, and left Unkrur a text message, stating, "What is it now? Why are you getting other people involved?" VRP (May 11, 2011) at 94. Pierce Transit issued a "no trespass" order against Greene, preventing him from riding the buses and looking for Unkrur. VRP (May 11, 2011) at 94.

Greene then began calling Unkrur late at night and leaving voice messages describing the contents of her apartment and stating: (1) "You know, you are not at your place"; and (2) "You are not at home. You left your lights on." VRP (May 11, 2011) at 92. Not wanting to be alone, Unkrur asked a male friend, Dan, to stay at her apartment; her daughter was also afraid to sleep in the apartment and began staying with family members. In mid-September, Unkrur moved out of her apartment because she was afraid that Greene would return and harm her or her daughter.

On September 4, Unkrur obtained a temporary protection order against Greene. Six days later, he violated it. On September 14, Unkrur obtained a two-year "no contact" protection

3

order, prohibiting Greene from coming near her or having any contact with her. On January 6, 2010, Greene pleaded guilty to two counts of violating this protection order. As part of his sentence, the trial court issued a second "no contact" protection order prohibiting Greene from contacting Unkrur for two years.

Approximately two months later, on March 16, Greene sent Unkrur a text message, (1) instructing her to "[c]all" him because he was not "pissed" anymore; and (2) threatening "to put Dan in the hospital" if Unkrur did not return his phone calls. VRP (May 11, 2011) at 98, 99, 102. Concerned for Dan's safety, Unkrur met with Greene "to calm [him] down." VRP (May 11, 2011) at 102. A day or two later, Greene started calling and texting Unkrur again, thereafter persisting in calling or texting her multiple times a day. He sent her pictures of his penis and threatened her with text messages, stating: (1) "What's this kills your white *ss slut *ss let me send you this show the punk this"; (2) "Ain't seen you all day"; (3) "Move out of town you lost privileges"; (4) "I was thinking to myself you don't have to bother calling you are scared . . . I am f*cked now you be"; (5) "Wanna play Chuckie";[3] and (6) "I know where you live now. I know where you now live." VRP (May 12, 2011) at 132, 138, 141, 142, 147, 158.

Unkrur tried to block Greene's calls; but he showed up at her work. She then kept in contact with him because she thought it was safer to talk to him over the phone than to have him show up unannounced at work.

In April, Greene threatened to hurt a passenger on Unkrur's train. She filed an incident report with the police and reported Greene for having violated the no contact protection order.

---

[3] According to Unkrur, the term "Chuckie" refers to the Chuckie horror films, which involve a doll that plays with knives and kills people. VRP (May 11, 2011) at 159.

On April 18, Greene left Unkrur a disturbing voicemail, threatening to kill her and "to *cut [her] head off*." VRP (May 12, 2011) at 204 (emphasis added). On May 15, he suggested in a text message that he was ready for a stand off with the police, stating, "I'm ready for anything them and the cops you owe me and I owe you. Chuckie." VRP (May 11, 2011) at 161. Two days later, he left Unkrur 22 voicemails and 11 text messages in a three-hour period. On May 18, Greene left Unkrur another threatening text message, this time stating, "I know who he is now. *I'm going to take care of him. Then I'm going to come after you*." VRP (May 11, 2011) at 106 (emphasis added).

Unkrur took these threats "seriously" because she knew he was capable of carrying out his threats. VRP (May 12, 2011) at 205. She filed second incident report with the police and again reported Greene for having violated the no contact protection order. The police took a taped statement from Unkrur, recorded her voicemails, and photographed her cell phone to document Greene's text messages.

## II. PROCEDURE

The State initially charged Greene with five counts of violating a domestic violence court order. On February 14, 2011, the State filed an amended information, adding one count of stalking and one count of felony harassment.[4] Greene was rearraigned on the amended

---

[4] Although this amended information was dated August 9, 2010, it was not filed until February 14, 2011, because there was initially some confusion about whether Greene had been arraigned on the amended information. *See* Verbatim Report of Proceedings (August 31, 2010) at 2 (trial court states case "not been set for rearraignment" and defense counsel responds he thought they had "done the rearraignment previously").

information the same day.[5] This amended information did not include the words that Greene's "threat to kill" in his felony harassment charge must have been a "true threat." *See* Clerk's Papers (CP) at 66. But Greene did not object to the language of the amended information on this ground either before or during trial.[6]

At trial, the State's witnesses testified to the facts previously described. The trial court instructed the jury on the law. The felony harassment "to convict" instruction did not mention that Greene's "threat to kill" must be a "true threat." CP at 142 (Instruction 28). Greene, again, did not object to this instruction or propose an alternate felony harassment "to convict" instruction. *See* VRP (May 16, 2011) at 223-27, 231-36 (objecting and taking exception only to the State's proposed instruction on stalking). Nevertheless, the trial court gave the jury a

---

[5] At the end of the August 31 hearing, at which the parties had first expressed confusion about whether Greene had been arraigned on the State's amended information, the trial court ordered "rearraignment" on the amended information "within one week." VRP (Aug. 31, 2010) at 5. Original defense counsel Aaron Talney eventually withdrew from representing Greene; and the confusion about the rearraignment persisted.

The record is not clear whether Greene was rearraigned on the amended information within the trial court's initial one-week deadline. When again brought to the trial court's attention on February 14, 2011, the trial court entered findings that (1) Greene had "constructive notice" of the amended information's adding the stalking and felony harassment counts because his trial counsel had received a copy of the amended information; and (2) Greene would not be "prejudiced" by rearraigning him and adding the stalking and felony harassment charges because the charges did not involve any new witnesses or substantive changes to the case. VRP (Feb. 14, 2011) at 16. The trial court accepted the State's amended information and rearraigned Greene the same day, stating, "I'm going to go ahead and rearraign him on those" counts in the amended information. VRP (Feb. 14, 2011) at 16.

[6] The record shows that Greene objected to the amended information only on the grounds that State had included six additional counts (Counts 8-13) based on Greene's threatening behavior in jail, which jail counts the trial court severed before trial on the stalking counts.

separate instruction defining "true threat," to which Greene did not object. CP at 140 (Instruction 26).

The jury found Greene guilty of stalking and felony harassment.[7] Greene appeals these two convictions.

ANALYSIS

I. FELONY HARASSMENT "TRUE THREAT" REQUIREMENT

For the first time on appeal, Greene argues that (1) a "true threat" is an essential element of felony harassment, and (2) the amended information and the felony harassment "to convict" instruction were constitutionally deficient because they did include this essential element of the offense. Greene fails to meet the RAP 2.5(a)(3) exception for our consideration of this unpreserved issue for the first time on appeal.

A. Standard of Review

Generally, we do not review issues raised for the first time on appeal unless the issue involves a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Under this standard, the defendant has the initial burden of showing that (1) the error was "'truly of constitutional dimension'" and (2) the error was "'manifest.'" *State v. Grimes*, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011) (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)), *review denied*, 175 Wn.2d 1010 (2012). If he successfully shows that a claim raises a manifest

---

[7] When the jury was unable to reach a verdict on five counts of Greene's violating a domestic violence court order, the trial court declared a "mistrial" and dismissed these counts without prejudice. VRP (May 18, 2011) at 332.

7

constitutional error, then the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt. *Grimes*, 165 Wn. App. at 186. Greene fails to meet his burden here.

### B. "True Threat" Not Essential Element

Both the United States and Washington Constitutions require that all "essential elements" of a crime—whether statutory or nonstatutory—be pleaded in the information and proved beyond a reasonable doubt. *State v. Allen*, 176 Wn.2d 611, 627 n.10, 294 P.3d 679 (2013); *State v. Vangerpen*, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995). The trial court's "to convict" instruction must also contain all essential elements of the offense, and its failure to do so constitutes "automatic reversible error." *State v. Smith*, 131 Wn.2d 258, 263, 265, 930 P.2d 917 (1997).

Consistent with federal and state constitutional freedom of speech protections,[8] Washington courts interpret statutes criminalizing threatening language as proscribing only "true threats," which the First Amendment does not protect. *State v. Atkins*, 156 Wn. App. 799, 805, 236 P.3d 897 (2010). A "true threat" is "''a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person.'''" *Allen*, 176 Wn.2d at 626 (quoting *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004) (alteration in original) (quoting *State v. Williams*, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001))).

---

[8] "''The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'''" *Allen*, 176 Wn.2d at 626 (quoting *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003)).

Relying on *State v. Johnston*, 156 Wn.2d 355, 127 P.3d 707 (2006), Greene argues that (1) "the 'true threat' requirement [is] an [essential] element of any harassment charge" that must be pleaded in the information and included in the "to convict" instruction; and (2) we should reverse his felony harassment conviction because his amended information and felony harassment "to convict" instruction did not meet these constitutional standards. Br. of Appellant at 9. The Washington Supreme Court has recently rejected this argument: "We have *never held* the true threat requirement to be *an essential element of a harassment statute*." *Allen*, 176 Wn.2d at 628 (emphasis added).

In *Allen*, our Supreme Court clarified that (1) "'the constitutional concept of 'true threat' merely defines and limits the scope of the essential threat element in the felony . . . harassment statute and is not itself an essential element of the crime'";[9] (2) because the "true threat" requirement is merely definitional and is not an essential element of the crime, it is not an "error" if the true threat requirement is not included in the information or "to convict" instruction; and (3) "so long as the jury [is] instructed as to the true threat requirement, the defendant's First Amendment rights [are] protected."[10] *See Allen*, 176 Wn.2d at 628-30. Because the *Allen* jury received a separate instruction explaining the "true threat" requirement, the Court held that the defendant's First Amendment rights were "protected" and he failed to demonstrate that a "manifest error affecting a constitutional right" had occurred, which precluded appellate review. *Allen*, 176 Wn.2d at 630; RAP 2.5(a)(3).

---

[9] *Allen*, 176 Wn.2d at 630 (quoting *State v. Tellez*, 141 Wn. App. 479, 484, 170 P.3d 75 (2007)).

[10] *Allen*, 176 Wn.2d at 630 (citing *Atkins*, 156 Wn. App. at 805-06).

*Allen* is dispositive here. As in *Allen*, Greene's amended information and felony harassment "to convict" instruction did not mention the "true threat" requirement. But the trial court gave the jury a separate instruction, identical to the instruction given in *Allen*, explaining the "true threat" requirement, including that in order to convict, Greene's "threat to kill" needed to be considered a "true threat." This instruction read, in part:

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

CP at 140 (Instruction 26). Just as in this instruction protected Allen's First Amendment[11] rights, it also protected Greene's rights.

Accordingly, we hold that (1) the "true threat" requirement is not an essential element of the felony harassment statute and need not have been included in the amended information or felony harassment "to convict" instruction; and (2) because the jury instructions included a separate instruction explaining the "true threat" requirement, the instructions as a whole were sufficient to protect Greene's First Amendment rights. Thus, no constitutional "error" occurred warranting our review for an unpreserved alleged error under RAP 2.5(a)(3).

## II. SAG ISSUES

### A. Arraignment on Amended Information

In his SAG, Greene first asserts that the trial court erred in failing to arraign him on the amended information, which added his stalking and felony harassment charges. Although there was some initial confusion about whether Greene had been arraigned on the amended

---

[11] U.S. CONST. amend. I.

information, this issue was resolved pretrial on February 14, 2011, when the trial court "rearraigned" Greene on his stalking and felony harassment charges and accepted the State's amended information. Verbatim Report of Proceedings (February 14, 2011) at 16 (trial court stating, "I'm going to go ahead and rearraign him on those [counts.]"). Because the record shows that Greene was arraigned on the amended information, his assertion to the contrary lacks merit.

B. *Knapstad*

Greene asserts that the trial court failed to exercise its "inherent power" to dismiss his charges under a sua sponte *Knapstad* motion.[12] SAG at 2 (ground 3). The record does not reflect that either Greene or his trial counsel filed a *Knapstad* motion or that the trial court ruled on such motion. Even if there had been a *Knapstad* ruling, because the jury has rendered its verdict, any pretrial *Knapstad* ruling is not appealable independent of a challenge to the sufficiency of the evidence at trial. *State v. Jackson*, 82 Wn. App. 594, 608-09, 918 P.2d 945 (1996), *review denied*, 131 Wn.2d 1006 (1997). Thus, this assertion also fails.

C. Motion To Dismiss Domestic Violence Court Order Violation Counts

Greene next asserts that the trial court erred in failing to dismiss his five counts of violating a domestic violence court order because the State was ultimately unable to obtain guilty verdicts on these counts. The record does not support this assertion: It does not show that Greene or his trial counsel moved to dismiss his five counts of violating a domestic violence court order on grounds that they lacked sufficient evidence or that the trial court ever ruled on

---

[12] A *Knapstad* motion is a pretrial challenge to the sufficiency of the evidence. *State v. Cannon*, 120 Wn. App. 86, 90, 84 P.3d 283 (2004).

11

such a motion.[13] The record does show, however, that when the jury was unable to return a verdict on these five counts, the trial court declared a mistrial and dismissed these counts without prejudice. Thus, this assertion also lacks support in the record.

## D. Sufficient Evidence

Greene does assert that the State presented insufficient evidence to support his convictions for stalking and felony harassment. We disagree.

### 1. Standard of review

When reviewing a challenge to the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). We defer to the jury on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

---

[13] The record shows that Greene filed two pro se motions asserting that the trial court should dismiss these counts under "double jeopardy" principles. Greene does not, however, assert this double jeopardy claim on appeal.

## 2. Stalking

Under former RCW 9A.46.110(1)[14],

> a person commits the crime of stalking if, without lawful authority and under circumstances not amounting to a felony attempt of another crime:
>      (a) He or she intentionally and repeatedly harasses or repeatedly follows another person; and
>      (b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and
>      (c) The stalker either:
>           (i) Intends to frighten, intimidate, or harass the person; or
>           (ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.

A person "repeatedly" harasses or follows another person if he does so on "two or more separate occasions." RCW 9A.46.110(6)(e); *State v. Kintz*, 169 Wn.2d 537, 546, 238 P.3d 470 (2010). "Attempts to contact or follow the person after being given actual notice that the person does not want to be contacted or followed constitutes prima facie evidence that the stalker intends to intimidate or harass the person." RCW 9A.46.110(4). A finding that the alleged stalker repeatedly and deliberately "appears" at the "person's *home*, school, *place of employment* . . . or any other location to maintain visual or physical proximity to the person is sufficient to find the alleged stalker follows the person." RCW 9A.46.110(6)(b) (emphasis added). The crime of stalking is also elevated to a felony where, as here, the stalking "violates any protective order protecting the person being stalked." RCW 9A.46.110(5)(b).

---

[14] Former RCW 9A.46.110, the law in effect at the time of Greene's crimes, was later amended by LAWS OF 2011, ch. 307, § 2, effective July 22, 2011. This amendment does not affect our analysis here; accordingly, we omit "former" from the remaining citations to this statute.

Here, the State presented evidence that, after Unkrur broke up with Greene, he had repeatedly contacted her by calling and texting her and had threatened to harm her and people close to her for about a year, with his contacts growing more intense over time and often involving multiple contacts a day. Greene also repeatedly and deliberately "appeared" at Unkrur's home and place of employment under circumstances where he could maintain close visual or physical proximity to her; this evidence alone was sufficient to establish that he had "followed" her. Unkrur testified that she was afraid for her safety and the safety of her friends and family because she knew Greene was a professional boxer, he had previously put a woman in a headlock, and he was capable of carrying out his threats. Unkrur's fear was objectively reasonable given the nature of their relationship and the severity and frequency of Greene's conduct.

The jury could also infer from the evidence (1) that Greene intended to frighten or to intimidate Unkrur because he had actual notice that Unkrur did not want to be contacted or followed in this manner (as evidenced by her two protection orders against him),[15] yet he continued to contact and to follow her; and/or (2) that Greene knew or reasonably should have known his conduct frightened, intimidated, or harassed Unkrur (as evidenced, for example, by his text message, stating, "I was thinking to myself . . . *you are scared* . . . I am f*cked now you be"). VRP (May 12, 2011) at 147 (emphasis added). Because Greene continued to contact and to follow Unkrur in this manner after being served with a domestic violence protection order, the

---

[15] *See, e.g.,* Green's September 9, 2009 statement on plea of guilty, which the prosecutor read into the record as follows: "[W]ith knowledge of valid protection order, I did unlawfully violate said order by knowingly contacting Carol Unkrur twice by phone," VRP (May 11, 2011) at 51; and plaintiff's exhibit 4, the January 6, 2010 no contact order, which Greene signed.

14

jury could find the facts necessary to convict him of a felony. Viewing the facts and inferences in the light most favorable to the State, we hold that there is sufficient evidence to support Greene's stalking conviction.

### 3. Felony harassment

Under former RCW 9A.46.020(1),[16] a person is guilty of harassment if

(a) Without lawful authority, the person knowingly threatens:
    (i) [t]o cause bodily injury immediately or in the future to the person threatened or to any other person[; and]
[. . .]
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

Harassment is elevated to a felony if the defendant harasses another person by "threatening to kill" the person threatened or another person. RCW 9A.46.020(2)(b). The threat to kill must be also interpreted as a "true threat." *Atkins*, 156 Wn. App. at 805; *see also Allen*, 176 Wn.2d at 626. The trier of fact uses an objective standard to determine whether the victim's fear that the threat will be carried out is reasonable. *State v. Alvarez*, 74 Wn. App. 250, 260–61, 872 P.2d 1123 (1994), *aff'd*, 128 Wn.2d 1, 904 P.2d 754 (1995). Importantly, "the nature of a threat depends on all the facts and circumstances." *State v. C.G.*, 150 Wn.2d 604, 611, 80 P.3d 594 (2003).

The State also presented evidence that Greene was "pissed" after Unkrur broke up with him. And over the course of a year, (1) he showed up unannounced at her home and work; (2) he repeatedly contacted her by phone, threatening to harm her and people close to her, VRP (May

---

[16] Former RCW 9A.46.020(1), the law in effect at the time of Greene's crimes, was amended by the legislature in 2011 by LAWS OF 2011, ch. 64, § 1, effective July 22, 2011. These amendments, however, do not affect our analysis here.

11, 2011) at 99; and (3) he often signed his text messages with the pseudonym "Chuckie," a reference to a horror movie in which a doll kills people with knives. VRP (May 12, 2011) at 159. Greene's threatening conduct so concerned Unkrur that she notified her supervisor about him, changed apartments, and got two protection orders against him.

But rather than ceasing his forbidden contacts, Greene's conduct intensified and grew more frequent over time, eventually culminated in Greene's threatening to kill Unkrur by "cut[ting her] head off." VRP (May 12, 2011) at 204. Based on the circumstances, a reasonable person in Greene's position would foresee that this statement would be interpreted as a "true threat," especially by Unkrur. Unkrur took Greene's threats "seriously," testifying that she was afraid for her safety and the safety of her friends and family because she knew Greene was a licensed professional boxer, he had previously put a woman in a headlock,[17] and he was capable of carrying out his threats. VRP (May 12, 2011) at 205. Given the nature of their relationship and the severity and frequency of Greene's threats, a jury could conclude that Unkrur's fear was reasonable. Viewing the facts and inferences in the light most favorable to the State, we hold that there is sufficient evidence to support Greene's felony harassment conviction.

E. Effective Assistance of Counsel

To prove ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v.*

---

[17] When a defendant is charged with felony harassment, evidence of prior violent acts or threats may be admitted to show the victim's fear of the defendant was reasonable. *State v. Binkin*, 79 Wn. App. 284, 292–93, 902 P.2d 673 (1995), *overruled on other grounds by State v. Kilgore*, 147 Wn.2d 288, 53 P.3d 974 (2002).

16

*Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). A defendant alleging ineffective assistance must overcome "'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012). If counsel's conduct "'can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *Kyllo*, 166 Wn.2d at 863). To show prejudice, the defendant must establish that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). A defendant's failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). Greene fails to meet his burden here.

### 1. Failure to move to continue

A defendant in custody is entitled to be tried within 60 days of arraignment. CrR 3.3(b)(1)(i), (c)(1). This 60-day time period, however, excludes "[d]elay granted by the court." CrR 3.3(e)(3). Under CrR 3.3(f)(2), "the court may continue the trial date to a specified date when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." Greene does not specify what "continuance" motion he wanted his trial counsel to file; nor does he explain the basis for his desired continuance motion or how he (Greene) would avoided prejudiced if counsel had

17

presented and the trial court had granted such motion.[18] We do not consider SAG issues where the defendant fails to supply sufficient specificity to inform us about "the nature and occurrence of [the] alleged errors." RAP 10.10(c). Accordingly, we do not further address Greene's ineffective assistance argument on this failure to move to continue ground.

### 3. Knapstad

A *Knapstad* motion is a pretrial challenge to the sufficiency of the evidence. *State v. Cannon*, 120 Wn. App. 86, 90, 84 P.3d 283 (2004). To prevail on a *Knapstad* motion, the defendant must show that there are no material facts in dispute and that the undisputed facts do not establish a prima facie case of guilt for the crimes charged. *Knapstad*, 107 Wn.2d at 356. A trial court may dismiss a criminal charge under *Knapstad* if the State's pleadings and evidence fail to establish prima facie proof of all elements of the charged crime. *State v. Sullivan*, 143 Wn.2d 162, 171 n.32, 19 P.3d 1012 (2001).

But, as we previously explained, once a case has gone to trial and a jury has rendered a verdict, a *Knapstad* issue is essentially moot and a challenge to the sufficiency of the evidence must be based on the full trial record. *Jackson*, 82 Wn. App. at 608-09. Here, the State

---

[18] Nor have we found any evidence in the record that Greene's trial counsel was deficient by failing to file a specific continuance motion or to protect Greene's speedy trial rights. On the contrary, the record shows that the State filed several continuance motions, that Greene vehemently opposed these motions, and that Greene's trial counsel diligently voiced Greene's objections each time.

presented sufficient evidence to support the jury's convicting Greene of stalking and felony harassment.[19] Thus, Greene's ineffective assistance challenge fails on this ground as well.

### III. PERSONAL RESTRAINT PETITION ISSUES

In his Personal Restraint Petition (PRP), Greene asserts several additional reasons why he believes he received ineffective assistance of counsel. Because Greene fails to carry his burden to show such ineffective assistance, we deny his petition.

When considering a timely PRP, courts may grant relief to a petitioner only if the petitioner is under an "unlawful" restraint, as defined by RAP 16.4(c). RAP 16.4(a). A PRP must include (1) a statement of facts upon which the claim of unlawful restraint is based and (2) the evidence available to support the factual allegations. RAP 16.7(a)(2); *In re Pers. Restraint of Williams*, 111 Wn.2d 353, 365, 759 P.2d 436 (1988). The petitioner's factual allegations must be "based on more than speculation, conjecture, or inadmissible hearsay." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). If a petitioner fails to provide sufficient evidence to support his factual allegations, we may dismiss his petition and decline to grant a reference hearing. *See Williams*, 111 Wn.2d at 365.

Additionally, the availability of PRP collateral relief is limited in two ways. *In re Pres. Restraint of Yates*, 177 Wn.2d 1, 16, 296 P.3d 872 (2013). First, "'[t]he petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue.'" *Yates*, 177 Wn.2d at 17

---

[19] Although the jury ultimately failed to return guilty verdicts on Greene's five counts of violating a domestic violence court order, these dismissed charges are not before us in this appeal from Greene's stalking and felony harassment convictions.

(quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)). Second, new issues must meet a heightened showing before a court will grant relief. *Yates*, 177 Wn.2d at 17. For alleged constitutional errors, "'a petitioner has the burden of showing actual prejudice.'" *Yates*, 177 Wn.2d at 17 (quoting *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007)). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). We review Greene's remaining ineffective assistance arguments under these PRP rules.

### A. No Evidence Counsel "Threatened" Greene To Plead Guilty

First, Greene asserts that he received ineffective assistance because his trial counsel "threaten[ed]" him that he needed to accept the State's guilty plea offer because the State would add two additional counts of felony harassment and stalking to his charges, which he further asserts that this violated his due process rights and his attorney client privilege. PRP at 6 (ground 1). Greene asserts that this conversation with counsel occurred on July 8, 2010, in the "CDPJ interview room," but he fails to supply supporting facts and evidence necessary for us to review this claimed error.[20] PRP at 6 (ground 1). Nor does Greene demonstrate that such a conversation, if it occurred, would have violated his attorney client privilege or amounted to deficient performance. Thus, this ineffective assistance argument fails.

---

[20] In contrast, the record before us shows only that the trial court entered an order on July 8 for Greene to undergo a competency evaluation at Western State Hospital. As we discuss in more depth later in this opinion, Greene's counsel's request for a competency hearing, without more, does not amount to deficient performance, especially where such a hearing was necessary to protect Greene's due process rights.

C. No Violation of Speedy Trial; Competency Evaluation

Greene next asserts that he received ineffective assistance because his trial counsel violated his speedy trial rights by requesting that he undergo a competency evaluation. This argument also fails.

A defendant in custody pending trial is entitled to be tried within 60 days of arraignment. CrR 3.3(b)(1)(i), (c)(1). Competency proceedings, however, are specifically excluded from this time for trial computation. CrR 3.3(e)(1). Greene fails to show a violation of his CrR 3.3 "speedy trial" rights based on the time it took for him to undergo a competency evaluation.

Greene also fails to show that his trial counsel was deficient in requesting this competency evaluation. The procedures of the competency statute (chapter 10.77 RCW) are mandatory, not merely directory. *State v. Wicklund*, 96 Wn.2d 798, 805, 638 P.2d 1241 (1982). "[O]nce there is a reason to doubt a defendant's competency, the court *must* follow the statute to determine his or her competency to stand trial." *City of Seattle v. Gordon*, 39 Wn. App. 437, 441, 693 P.2d 741 (emphasis added), *review denied*, 103 Wn.2d 1031 (1985). Failure to follow procedures necessary to protect a defendant's right not to be tried while incompetent is a denial of due process. *State v. O'Neal*, 23 Wn. App. 899, 901, 600 P.2d 570 (1979) (citing *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)).

The record before us on direct appeal, with which Greene's PRP has been consolidated, shows a reasonable doubt about Greene's competency based on his persistent outbursts during pretrial hearings and his threatening conduct toward his trial counsel and the jail staff. Greene's trial counsel, thus, was not deficient in asking that Greene undergo a competency evaluation; on

21

the contrary, counsel was protecting Greene's due process rights. Greene's ineffective assistance argument fails on this basis as well.

### D. Special Counsel Not Ineffective

Greene next asserts that his special counsel (Vanessa Martin) provided ineffective assistance when she opposed his trial counsel's (Talney) motion to withdraw and motion for an order that Greene had forfeited his right to counsel. We disagree.

The record shows that Greene's special counsel vigorously opposed Talney's motions. She also moved for (1) an ex parte hearing due to the sensitive nature of the issues discussed and (2) to seal Talney's brief, which she believed contained some attorney client privilege material Although the trial court ultimately denied these motions and allowed Talney to withdraw, Greene's special counsel was successful in opposing Talney's motion that Greene had forfeited his right to counsel, which resulted in the trial court's ordering the Department of Assigned Counsel to assign another attorney to represent Greene at trial. We discern no deficiency in Greene's special counsel's performance; nor has Greene demonstrated that he was prejudiced by any of her actions. Again, Greene's ineffective assistance argument fails.

### E. No Evidence Counsel "Misled" Greene; Statements in Brief Proper

Next, Greene asserts that he received ineffective assistance because his special counsel (1) "misled" him when moving to hold an ex parte hearing to discuss Talney's motion to withdraw and motion for an order that Greene had forfeited his right to counsel; and (2) erroneously stated in her brief that Greene was "not cooperat[ing] with the [competency] examiner." PRP at 16 (ground 4); PRP at 18. Again we disagree.

22

The record does not reflect whether the trial court ever ruled on Martin's motion for an ex parte hearing. Greene does not provide any evidentiary support that the trial court actually held such an hearing ex parte; nor does he explain how Martin "misled" him by filing her motion. Greene also fails to argue that filing this motion, on which the trial court may or may not have ruled, (1) was deficient performance, rather than counsel's tactical choice and (2) prejudiced him. Similarly, Greene also does not explain how Martin's statement that he (Greene) could have an undiagnosed mental illness but that this could not be determined because he was not "cooperat[ing] with [his competency] examiner"[21] (1) was deficient performance, rather than counsel's tactical choice; and (2) prejudiced him. Greene's ineffective assistance arguments on these bases also fail.

F. Ongoing Ineffective Assistance Assertions

Last, Greene asserts that he is "still . . . being denied ineffective assistance" because (1) his trial counsel failed to file "motion[s]" "in crucial parts" of his pretrial and trial proceedings and (2) his appellate counsel raised the same issues that he did in his SAG. PRP at 25 (ground 5). These argument also fail.

Again, Greene does not explain which motions his trial counsel allegedly neglected to file on his behalf.[22] And the record shows that Greene's appellate count filed her opening brief nearly a month and a half *before* Greene filed his Amended SAG, in which Greene then asserted

---

[21] PRP at 18.

[22] And, to the extent that Greene argues his trial counsel was deficient in failing to file a continuance and a *Knapstad* motion, we have already addressed and rejected these arguments in his direct appeal. And he fails to demonstrate why the interests of justice require relitigation of these issues. *See Yates*, 177 Wn.2d at 17; *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001).

the same arguments as appellate counsel. Moreover, the sequential timing of appellate counsel's and Greene's filing their respective briefs conclusively demonstrates that appellate counsel was not deficient because, as Greene implausibly asserts, she merely "copied" his SAG arguments. Greene not only misstates the record on this point, but also fails to show deficient performance on these last two bases.

We affirm Greene's convictions and we deny his personal restraint petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Hunt, P.J.

We concur:

_____
Penoyar, J.

_____
Bjorgen, J.